2011 OK CR 30

Gilbert Ray POSTELLE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. D–2008–934.

Court of Criminal Appeals of Oklahoma.

Dec. 29, 2011.

Catherine Hammarsten, James Hughes, Asst. Public Defenders, Oklahoma City, Oklahoma, attorneys for defendant at trial.

David Prater, District Attorney, Steve Deutsch, Assistant District Attorney, Okla-

homa City, Oklahoma, attorneys for State at trial.

Andrea Digilio Miller, Oklahoma County Public Defender's Office, Oklahoma City, Oklahoma, attorney for appellant on appeal.

W.A. Drew Edmondson, Oklahoma Attorney General, Seth S. Branham, Assistant Attorney General, Oklahoma City, Oklahoma, attorneys for appellee on appeal.

## OPINION

A. JOHNSON, Presiding Judge.

¶ 1 Appellant Gilbert Ray Postelle was tried by jury and convicted in the District Court of Oklahoma County, Case No. CF–2005–4759, of four counts of First Degree Murder (Counts 1–4), in violation of 21 O.S.Supp.2004, § 701.7, and one count of Conspiracy to Commit a Felony (Count 5), in violation of 21 O.S.2001 § 421.[1] The jury imposed the death penalty on Counts 1 and 4 after finding that Postelle created a great risk of death to more than one person and that each of those murders was especially heinous, atrocious or cruel. 21 O.S.2001, § 701.12(2) & (4). The jury fixed punishment at life imprisonment without the possibility of parole on Counts 2 and 3 and ten years imprisonment on Count 5. The Honorable Ray C. Elliott, who presided at trial, sentenced Postelle accordingly and ordered the sentences in Counts 2, 3 and 5 to be served consecutively. From this judgment and sentence Postelle appeals. We affirm.

## BACKGROUND

¶ 2 On Memorial Day, 2005, James Donnie Swindle, Terry Smith, Amy Wright and James Alderson were shot to death outside Swindle's trailer located next to a salvage

yard and alignment shop in an industrial area of Del City, Oklahoma.[2] Several witnesses in the area heard multiple gunshots and saw a maroon Dodge Caravan leaving the salvage yard shortly after the shots were fired. The owner of a flower shop nearby saw four men in the minivan; she testified that the men had dark hair and that she believed they were either Caucasian or Hispanic. A security camera across the street from the salvage yard captured on videotape the minivan entering and leaving the salvage yard driveway. Neither the license tag nor the occupants could be seen on the videotape. Sandra Frame, a bartender working at a bar next to the alignment shop, heard gunshots around 6:15 p.m. She heard the minivan accelerating and saw it leaving the crime scene. She could see there were at least two men in the minivan and she observed them laughing. She glimpsed the man in the passenger seat for a few seconds; he was young with dark hair and facial hair, possibly Hispanic. She was later shown a photographic lineup and was "eighty-five percent sure" that David Postelle was the man she saw in the passenger seat of the minivan that day.

¶ 3 Oklahoma City Police Officer Rocky Gregory was on traffic duty down the street from the salvage yard when two people approached him and reported hearing gunfire from the vicinity of the salvage yard. Gregory and his partner investigated and found Smith and Swindle, each dead from multiple gunshot wounds. The bodies of the two other victims, Alderson and Wright, were discovered further north after other officers arrived.

¶ 4 Several people who were at the Postelle home on Memorial Day testified at Gilbert Postelle's trial, including Crystal Baumann,[3] Arthur Wilder,[4] Alvis "Jay" Sanders[5]

---

1. Count 1 charged Postelle with the murder of Amy Wright, Count 2 charged Postelle with the murder of Terry Smith, Count 3 charged Postelle with the murder of James Donnie Swindle and Count 4 charged Postelle with the murder of James Alderson. Postelle was charged jointly with his father, Earl Bradford Postelle, his brother, David Bradford Postelle, and Randall Wade Byus.

2. James Donnie Swindle was known as and referred to throughout the record as Donnie Swindle.

3. Baumann faced charges for several crimes related to this case. She entered into an immunity agreement in August 2005 providing for her full cooperation with the State to prosecute these murders in exchange for immunity from prosecution for any crimes she could be held liable for stemming from this incident, provided there would be no immunity from prosecution for any

and Randall Byus.[6] The Postelle home was routinely used by these four and others as a place to smoke methamphetamine in the "smoke room." Memorial Day 2005 was no different. Crystal Baumann and Arthur Wilder, admitted methamphetamine addicts, testified they had gone to the Postelle home on Memorial Day to get high. On that day, they both said, Gilbert and David Postelle talked about their belief that Donnie Swindle was responsible for the motorcycle accident that left their father, Brad, both physically and mentally impaired.[7] Wilder recalled Gilbert and David Postelle naming Swindle as one of those responsible for the accident and saying that those responsible were "going to pay" for the damage done to their father.[8] Their conversation subsequently turned to target shooting. Wilder had come equipped with his newly acquired MAK–90 rifle to go target shooting with the Postelle brothers.[9] David Postelle had an SKS rifle he used for target practice. Because they needed ammunition, Gilbert Postelle, Baumann and Wilder went to a house in Del City where a friend gave Gilbert Postelle a speed loader for the MAK–90 rifle and a bag of bullets that could be used in both the MAK–90 and SKS rifles.

¶ 5 Later that day, Gilbert, David and Brad Postelle, along with Wilder, Baumann and Randall Byus left in the Postelles' maroon Dodge Caravan. Baumann denied knowing about a plan to shoot Swindle at the time they left. She and Wilder were dropped off at the home of Wilder's brother. Wilder, however, testified that he had heard the Postelles talking about a plan to go to Swindle's house and shoot him. He was unsure they would go through with it, but their conversation worried Wilder enough to insist the Postelles take him and Baumann home. Hours later David Postelle returned Wilder's MAK–90 to him. Wilder and Baumann took the gun to their storage unit and hid it. Wilder heard about the murders from a friend, put "two-and-two together" and worried that the rifle he had left in the Postelles' minivan had been used in the murders. Wilder's fear that the Postelles had used his rifle to commit murder was confirmed when he saw the Postelles' minivan leaving Swindle's property on a surveillance camera video on the local news. A few days after the murders, Gilbert Postelle told Wilder how he had chased everyone outside after breaching the door of Swindle's trailer

crime that would make Baumann a principal to the crime of homicide in any degree. (Defendant's Exhibit 35)

4. Wilder was charged with Accessory After the Fact, Unlawful Possession of a Firearm, Concealing Stolen Property and Possession of a Sawed-off Shotgun. Wilder entered a blind plea and was sentenced to 180 years imprisonment subject to one-year judicial review. On judicial review, Wilder agreed to testify and his sentence was vacated by the sentencing judge, who agreed to entertain a new recommendation following the trials related to this matter. Wilder signed an Agreement to Cooperate and Testify Truthfully that provided he would be allowed to withdraw his original plea and re-enter a new plea of nolo contendere to the previous charges, plus some drug charges, and receive five years on each count to be served concurrently and with credit for time served. Wilder testified that the acceptance by the court of this plea bargain would result in his release from prison because of his credit for time served. (Defendant's Exhibit 41)

5. Sanders entered a guilty plea to Accessory After the Fact to the offense of First Degree Murder for his disposal of evidence after the murders. In exchange for his truthful testimony, the State recommended, and Sanders was given, a 12–year

split sentence per his plea agreement of six years imprisonment with the remaining six years suspended. According to Sanders, he had discharged his sentence by the time of Postelle's trial. (Defendant's Exhibit 38)

6. Byus was originally charged in the same Information with Postelle with four counts of First Degree Murder and one count of Conspiracy to Commit Murder. He pled guilty to Accessory to a Felony (First Degree Murder). In exchange for his truthful testimony, the State agreed to recommend a split sentence of six years imprisonment with the remaining fourteen years suspended. (Defendant's Exhibit 39)

7. Gilbert Postelle's father, Earl Bradford Postelle, was referred to as "Brad" throughout the record.

8. There was also testimony that David and Gilbert Postelle were angry with Swindle because Swindle allowed someone to steal parts off of one of their cars that was stored on Swindle's property.

9. Wilder's rifle was referred to by several witnesses as an AK–47, but the State's firearm and toolmark examiner identified it as a MAK–90.

and how he then shot them outside. Gilbert Postelle then noticed Baumann standing nearby and ordered her to keep quiet about what she had overheard.

¶ 6 Jay Sanders testified that he had been living at the Postelle home the month before the murders.[10] Sanders said that the patriarch, Brad Postelle, talked about having bad dreams about his motorcycle accident and his conviction that Swindle was responsible for that accident. According to Sanders, Gilbert and David Postelle were devastated by the accident and its effect on their father.

¶ 7 On Memorial Day, Sanders said he was in and out of the smoke room throughout the day, getting high and working on his broken-down van. Sanders was in the smoke room when he learned that the Postelles were going to go target shooting. Sanders said someone put the SKS rifle in the Postelles' minivan, and he helped Brad Postelle into the van. David, Gilbert and Brad Postelle left with Wilder and Byus, but only the Postelles returned.[11] Later that night or the next morning, Sanders learned of the murders from the news; all the television sets in the Postelle home were tuned to news stations showing the security videotape of the minivan entering and leaving the murder scene. The Postelles also received several telephone calls from friends telling them about the murders. Sanders recalled that the Postelle home had "a different kind of atmosphere" and that there was a lot of whispering among the Postelle family.

¶ 8 Sanders testified that a couple of days after the murders, the Postelles were discussing different ideas about what to do with the minivan "since it might be the van on the news." It was decided that Sanders and Daniel Ashcraft would take the minivan to Indiana, set it on fire and ultimately put it in a lake.[12] Sanders wiped the van down and drove it to Indiana to the home of a Postelle relative. Sanders also purged the Postelle home of drugs and drug paraphernalia. He buried gun parts and the minivan license plate in the backyard. After Sanders returned from Indiana, he was privy to a conversation in which Gilbert Postelle said, "I shut that bitch up in the corner" and mimed shooting a rifle at someone. Sanders testified that he, Gilbert, David and some other Postelle family members discussed fabricating a story for the police to shield the Postelles from being implicated in the murders.

¶ 9 The State's firearm and toolmark examiner examined the many casings collected at the murder scene and determined that they were fired from two guns: Wilder's MAK–90 rifle and another rifle, possibly an SKS rifle. David Postelle's SKS rifle was never found. Law enforcement located the Postelles' van in Indiana and searched it. The alterations to the van observed by the investigators were consistent with Sanders's testimony about efforts to disguise it.

¶ 10 Randall Byus was with the Postelles when they shot the victims. According to Byus, he accompanied the Postelles, Wilder and Baumann, believing the Postelles were taking Baumann and Wilder home and then going target shooting. He saw Wilder's MAK–90 and David Postelle's SKS rifle in the Postelles' minivan. Nothing appeared unusual as they dropped off Baumann and Wilder. When David Postelle turned the van around and headed away from their normal place for target shooting, Byus asked where they were going, and was told that they were going to Swindle's house first, for some "shit," which Byus understood meant drugs. Byus first understood the Postelles' murderous plan when Gilbert Postelle asked his father a block from Swindle's trailer what to do if Donnie Swindle's father was there and Brad Postelle said to kill everybody there. Byus voiced disbelief and Brad Postelle responded that Donnie Swindle had tried to kill him. At the trailer, Byus witnessed Gilbert Postelle open the van door and shoot Terry Smith, who was near the minivan, in the face. Gilbert Postelle and his father then shot Donnie Swindle, causing him to fall to the ground. Swindle looked up and asked what

---

10. Sanders's real name is Alvis Earl Sanders, Jr. but he was known as and referred to as "Jay."

11. Sanders recalled that Baumann left in another vehicle with a friend.

12. Sanders and Ashcraft did not follow through with burning the van and submerging it in a lake. The police later found the van.

was going on and David Postelle took the gun from his father and shot Swindle in the head. Gilbert Postelle turned and ran through the trailer, looking for others and firing his gun. He emerged and chased down James Alderson and shot him as Alderson tried to seek cover under a boat. After David Postelle told his cadre to get in the van, Byus heard two more shots. When Gilbert Postelle got in the van, he said, "that bitch almost got away." As they drove away, Brad Postelle hugged his sons and said, "That's my boys." On the way back to the Postelle home, the Postelles warned Byus against telling anyone what they had done.

### 1. Sufficiency of the Evidence

¶ 11 Postelle argues that the only evidence putting him among the assailants at the murder scene and implicating him in these crimes was the trial testimony of accomplices, namely Randall Byus, Arthur Wilder, Crystal Baumann and Jay Sanders. The accomplice testimony, he contends, was not sufficiently corroborated resulting in insufficient evidence to support his convictions. Postelle filed a Motion to Quash and Dismiss prior to trial, arguing that the lack of corroborating evidence of accomplice testimony required dismissal. The district court denied the motion. Postelle demurred to the State's evidence during trial, renewing the argument that there was no corroboration of the accomplice testimony.

¶ 12 This Court will uphold a verdict of guilt if, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt. *Logsdon v. State*, 2010 OK CR 7, ¶ 5, 231 P.3d 1156. 1161; *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04. In evaluating the evidence presented at trial, we accept all reasons, inferences and credibility choices that tend to support the verdict. *Warner v. State*, 2006 OK CR 40, ¶ 35, 144 P.3d 838, 863.

¶ 13 Under Oklahoma law, a conviction cannot rest upon the testimony of an accomplice unless the accomplice's testimony is corroborated by other evidence that tends to connect the defendant with the commis-

sion of the offense. 22 O.S.2001, § 742. Accomplice testimony must be corroborated with evidence that, standing alone, tends to link the defendant to the commission of the crime charged. *Pink v. State*, 2004 OK CR 37, ¶ 15, 104 P.3d 584, 590. An accomplice's testimony need not be corroborated in all material respects, but requires "at least one material fact of independent evidence which tends to connect the defendant with the commission of the crime." *Cummings v. State*, 1998 OK CR 45, ¶ 20, 968 P.2d 821, 830. Corroborative evidence is not sufficient if it requires any of the accomplice's testimony to form the link between the defendant and the crime, or if it tends to connect the defendant only with the perpetrators and not the crime itself. *Glossip v. State*, 2007 OK CR 12, ¶ 42, 157 P.3d 143, 152. The purpose of the accomplice corroboration rule is to ensure that an accused is not falsely implicated by someone equally culpable in order to seek clemency, or for motives of revenge or any other reason. *Collier v. State*, 1974 OK CR 49, ¶ 7, 520 P.2d 681, 683.

¶ 14 Specifically, Postelle argues that Randall Byus was an accomplice and that Byus's testimony placing him at the murder scene was not corroborated by independent evidence. Postelle contends that the testimony of Baumann, Wilder and Sanders is insufficient to corroborate Byus's testimony because they are accomplices as well. Furthermore, Postelle argues that, even if the testimony of Baumann, Wilder and Sanders is sufficient to corroborate Byus's testimony that he was present during the murders, these witnesses cannot corroborate Byus's testimony that Postelle shot each victim and was responsible for all four murders.

¶ 15 A witness is an accomplice to the crime at trial if the witness could be charged with the same offense. *Jones v. State*, 2006 OK CR 5, ¶ 33, 128 P.3d 521, 538. Under 21 O.S.2001, § 172, all persons who directly commit the act constituting the offense or aid and abet in its commission, even if not present, are principals and can be charged as an accomplice and held criminally

liable.[13] Wilder testified that on Memorial Day 2005 he heard the Postelle brothers talking about their conviction that Swindle had been somehow responsible for their father's motorcycle accident and that anyone responsible "is going to pay." From these conversations, Wilder feared that Gilbert and David Postelle planned to shoot Swindle later that day. He got in the van with them along with Brad Postelle, Randall Byus and Crystal Baumann. He brought his loaded MAK–90 rifle with him (on the trip to his brother's house) and left it with the Postelles, suspecting they might well be on their way to Swindle's house intending to shoot him. A rational jury could reasonably conclude from such evidence that Wilder, although not present, aided the Postelles in the murders, by knowingly providing the murder weapon and find that he could have been charged as an accomplice.

¶ 16 Randall Byus admitted being present when the murders were committed and his DNA was found on one of the projectiles found at the murder scene. He was charged in the same Information as Postelle with four counts of First Degree Murder and one count of Conspiracy. Byus ultimately pled guilty before his scheduled trial to "accessory" as part of an agreement providing for his cooperation and testimony in this case. Regardless of the crime for which he was ultimately convicted, a rational jury could have rejected Byus's trial testimony minimizing his involvement and found that he participated in the murders and was properly charged with Postelle as an accomplice. Under the test for accomplice liability, the evidence was susceptible to a finding that Byus and Wilder were accomplices whose testimony required corroboration. There is no evidence, however, supporting a finding that either Baumann or Sanders were present during the murders or aided or encouraged the commission of the murders in any way beforehand. Hence, they could not be accomplices to the murders and their testimony could be considered without any need for corroborating evidence.

Their testimony can also provide the necessary independent evidence to corroborate the testimony of Byus and Wilder. *Cummings*, 1998 OK CR 45, ¶ 20, 968 P.2d at 830 (at least one material fact of independent evidence tending to connect the defendant with the crime is sufficient corroboration of accomplice testimony).

¶ 17 Sanders testified that he helped Brad Postelle into the Postelles' maroon Dodge Caravan to go target shooting with his sons, and Byus and Wilder in the late afternoon of Memorial Day 2005. He saw David Postelle's SKS rifle in the van; Wilder's MAK–90 was proven to be one of the two weapons used in the killings. Sanders recognized the Postelles' van entering and leaving Swindle's property on the surveillance videotape on the news because of a missing hubcap. Sanders testified about conversations with Gilbert Postelle and his family about concealing evidence and concocting a story to tell the police. Sanders also repeated an admission he heard Gilbert Postelle make about killing Amy Wright while he mimed shooting a rifle. Baumann heard Gilbert Postelle take responsibility for the murders on another occasion and observed him make a "spraying" motion as though he were shooting people. Postelle threatened Baumann, ordering her to say nothing about what she had heard. Baumann said that Gilbert Postelle mentioned his gun jamming when he switched clips. The State's firearms expert testified that a live round is often ejected to clear a gun jam and one live round was found at the crime scene. The discovery of the live round further corroborates Gilbert Postelle's confession and, in turn, Baumann's testimony repeating it.

¶ 18 If an accomplice's testimony is corroborated as to one material fact by independent evidence tending to connect the accused with the commission of the crime, the jury may infer that the accomplice speaks the truth as to all. *Glossip*, 2007 OK CR 12, ¶ 42, 157 P.3d at 152. An accused's

---

**13.** OUJI–CR(2d) 9–26 defines accomplice as:

An "accomplice" is one who, with criminal intent, is involved with others in the commission of a crime. A person becomes an accomplice either by being present and participating in a crime or, regardless of whether he/she is present during the commission of a crime, by aiding and abetting before or during its commission, or by having advised or encouraged its commission.

admissions as well as an accused's attempts to conceal a crime can be sufficient to corroborate an accomplice's testimony. *See Id.* at ¶ 47, 157 P.3d at 153; *Wackerly v. State,* 2000 OK CR 15, ¶ 24, 12 P.3d 1, 11. The testimony of Sanders and Baumann about Gilbert Postelle's admissions and involvement in conversations about concealing evidence of the murders provided the necessary independent evidence specifically connecting Gilbert Postelle with the commission of the murders. The testimony of Wilder and Byus was sufficiently corroborated, making the evidence overall sufficient to support Gilbert Postelle's convictions.

■■■ ¶ 19 Postelle also claims the evidence was insufficient to prove he was part of a conspiracy to commit murder. He maintains that the evidence showed that he was not a party to a conspiracy to murder, but rather simply followed the order his father gave as they pulled into Swindle's driveway—to kill everyone at Swindle's trailer. We disagree. Gilbert Postelle's actions and statements prove otherwise.

¶ 20 The evidence showed that Postelle had gone to a friend's house for ammunition earlier that day. He and Wilder loaded and taped together two thirty-round clips for Wilder's MAK–90. According to Wilder, both Gilbert and David Postelle had discussed shooting Swindle in revenge for causing their father's motorcycle accident. When Byus voiced concern and objection to Brad Postelle's direction to kill everyone there, Gilbert Postelle told Byus that Swindle was the one responsible for his father's motorcycle wreck. This evidence tended to prove that Gilbert Postelle knew they were there to kill Swindle and that he was part of a conspiracy to murder him. The conspirators' plan included leaving no witnesses and Postelle simply hoped that he would not have to kill someone he liked. The evidence was sufficient for a rational jury to find Postelle guilty of conspiracy to commit murder beyond a reason-

able doubt. Postelle's claims challenging the sufficiency of the evidence supporting his convictions are denied.

## 2. Accomplice Instructions

■■■ ¶ 21 Postelle argues that the district court erred in failing to instruct the jury on the need for corroboration of accomplice testimony. Postelle requested accomplice instructions and the court denied the request, finding that the evidence did not support a finding that Byus, Wilder, Sanders or Baumann were accomplices.[14] Postelle contends that the failure to submit appropriate instructions on accomplice testimony relieved the State of its burden of proof and denied him a fair trial in both stages of trial because the testimony of accomplice Byus was the basis for both finding him guilty and for imposing the death penalty.

¶ 22 This Court has set forth rules for submitting accomplice instructions many times.

If the evidence is uncontroverted and it establishes that the witness is an accomplice, the trial judge must so rule as a matter of law and instruct the jury that his testimony requires corroboration. Likewise, if the undisputed evidence indicates that the connection of the witness with the crime was innocent and lacking in criminal intent, or that he merely had knowledge and therefore is not an accomplice, the trial judge must so rule. However, if evidence is susceptible to alternative findings that the witness is or is not an accomplice, then the issue is a question of fact to be submitted to the jury under proper instruction.

*Nunley v. State,* 1979 OKCR 107, ¶ 10, 601 P.2d 459, 462–63; *see also Bryson v. State,* 1994 OK CR 32, ¶ 38, 876 P.2d 240, 256.

■■■ ¶ 23 As discussed above, there was evidence from which a jury could find that both Byus and Wilder were accomplices.

**14.** The defense requested OUJI–CR(2d) 9–25 Use of Accomplice Testimony, 9–26 Accomplice Defined, 9–28 Corroborating Evidence Needed for Accomplice Testimony, 9–29 Determination of Accomplice Status by Jury for Alvis "Jay" Sanders, Arthur Wilder, Randall Byus, and Crystal Baumann, 9–31 When Corroboration by Accom-

plice is Insufficient and 9–32 Determining when Corroboration by Accomplice is Sufficient. Postelle asked the trial court to instruct the jury that Sanders, Byus and Baumann were accomplices as a matter of law and to have the jury decide Wilder's status.

The district court erred in failing to submit accomplice instructions concerning these witnesses. The failure to submit instructions on the issue of accomplices and the need for accomplice testimony to be corroborated is harmless where sufficient corroborating evidence is otherwise present in the record. See *Howell v. State*, 1994 OK CR 62, ¶ 28, 882 P.2d 1086, 1092; *Bryson*, 1994 OK CR 32, ¶ 39, 876 P.2d at 256. The testimony of Byus and Wilder implicating Gilbert Postelle in the murders was corroborated by the non-accomplice testimony of Baumann and Sanders. Wilder's testimony that on Memorial Day the Postelle brothers discussed their conviction that Donnie Swindle was responsible for their father's accident was corroborated by Crystal Baumann. Baumann further corroborated Wilder's and Byus's testimony that Gilbert Postelle was in the van with his brother, his father and Byus when she and Wilder were dropped off. Ballistics evidence corroborated Byus's testimony that Wilder's rifle was one of the murder weapons used in the quadruple homicide. The physical evidence at the crime scene also corroborated Byus's account of the shooting rampage. Jay Sanders corroborated Wilder's testimony that the group traveled in the Postelles' minivan the afternoon of the shooting and that David Postelle's SKS rifle was in the van. The flower shop owner saw four men leaving the murder scene in the minivan, corroborating Byus's testimony that he and the three Postelles were in the van. The most compelling evidence corroborating Byus's and Wilder's testimony, however, came from Gilbert Postelle himself, in his statements to Baumann and Sanders about the murders and, specifically, his statements about killing Amy Wright. The record contains sufficient evidence corroborating any accomplice testimony. Any error resulting from the court's failure to give appropriate accomplice instructions was harmless and did not contribute to the conviction or sentence in this case.

### 3. Jury View

 ¶ 24 Postelle argues that the district court abused its discretion by allowing the jury to view the crime scene and a firearms demonstration at the Oklahoma City Police Department gun range. See *Suggs v. State*, 1973 OK CR 236, ¶¶ 13–14, 509 P.2d 1374, 1377(allowing jurors to view place of offense is within discretion of district court and is governed by 22 O.S., § 851). He complains that: 1) the crime scene was in a materially different condition than at the time of the murders; 2) a crime scene technical investigator was allowed to narrate where evidence was located during the crime scene investigation; 3) the jury was allowed to go inside the bar and see where the bartender was standing when she observed the minivan leaving the scene; 4) the jury was allowed to see where the surveillance camera was located; and 5) a juror was allowed to ask a question.[15]

¶ 25 Defense counsel objected neither to the jury view and the manner in which it was conducted nor to the firearms demonstration. Review is for plain error only. See *Simpson v. State*, 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698 (plain error is error that counsel failed to preserve through a trial objection, but upon appellate review, is clear from the record and affected the defendant's substantial rights). This claim merits little discussion because the record does not show, nor does Postelle explain, how he was prejudiced by anything that occurred during the view or firearms demonstration. It is his burden to show that alleged error affected his substantial rights and he has not done so here. See *Cuesta–Rodriguez v. State*, 2010 OK CR 23, ¶ 109, 241 P.3d 214, 246, *cert. denied*, —— U.S. ——, 132 S.Ct. 259, 181 L.Ed.2d 151 (2011) (holding that plain error requires, among other things, showing that error affected a substantial right); 20 O.S.2001, § 3001.1 (prohib-

15. Title 22 O.S.2001, § 851 provides:
When, in the opinion of the court, it is proper that the jury should view the place in which the offense was charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body, in the custody of proper officers, to the place, which must be shown to them by a person appointed by the court for that purpose, and the officers must be sworn to suffer no person to speak to or communicate with the jury, nor to do so themselves, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time.

iting setting aside of judgment unless reviewing court is of opinion that alleged error constitutes substantial violation of constitutional right or statutory right or has probably resulted in a miscarriage of justice). This claim is denied.

### 4. Extra–Judicial Identification

¶ 26 Postelle argues that he was denied due process by the admission of a tainted eyewitness identification of his brother, David Postelle. Postelle did not object to bartender Sandra Frame's identification of David Postelle on this basis; review is for plain error only. *See Harmon v. State*, 2011 OK CR 6, ¶ 42, 248 P.3d 918, 935, *cert. denied*, —— U.S. ——, 132 S.Ct. 338, 181 L.Ed.2d 211 (2011); *Cole v. State*, 1988 OK CR 288, ¶ 6, 766 P.2d 358, 359.

¶ 27 Frame identified David Postelle's photograph from a six-man photo line-up assembled by a police detective. Frame indicated that she was 85% sure the photo of David Postelle was the man she saw in the front passenger seat of the minivan leaving the crime scene. Postelle complains that Frame's extra-judicial identification should have been excluded because the photographic identification procedure was impermissibly suggestive. He contends Frame's identification of David Postelle was tainted because she did not view the photo lineup until after she saw David Postelle's booking photograph in a newspaper article about the murders and because the photograph of David Postelle in the lineup was the same booking photo featured in the newspaper article.

¶ 28 The rule governing an eyewitness's identification of a defendant at trial after a pretrial identification of that defendant by a photograph was set forth in *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The Supreme Court held that convictions based on "eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* Neither this rule nor the others traditionally used in analyzing this type of claim fit the situation presented here.[16] This is so because generally when a defendant contests an eyewitness's identification, the eyewitness has identified the defendant as the perpetrator and the reviewing court must decide if a pre-trial confrontation tainted the witness's identification of the defendant at trial. The cases cited by Postelle involve such situations and do not address a witness's identification of someone other than the defendant.

¶ 29 We do not decide if Postelle's right to due process was violated by admission of Frame's possibly tainted identification of someone else because we are convinced that error, if any, was harmless beyond a reasonable doubt. The key, and most compelling, evidence against Postelle came from Randall Byus, who was present during the murders and gave an eyewitness account of Postelle's murderous actions. His identification of Gilbert Postelle was not based on any pretrial identification by photograph, but rather on his personal observation and familiarity with Postelle. The evidence showed that Postelle used Wilder's MAK–90 in a lethal rampage that left four people dead. Postelle participated in conversations about covering up the crime and made statements implicating himself in the murders, particularly in the murder of Amy Wright. We conclude that the minds of an average jury would not have found the State's case significantly less persuasive had Frame's identification of David Postelle been excluded. Our review of the record leaves us with no reasonable doubt that the jury would have reached a different verdict without the identification. We find any error in the admission of Frame's identification of David Postelle did not contribute

---

**16.** For instance, this Court considers several factors in determining whether a courtroom identification was tainted by a pre-trial confrontation, including (1) the prior opportunity of the witness to observe the defendant during the alleged criminal act; (2) the degree of attention of the witness; (3) the accuracy of the witness's prior identification; (4) the witness's level of certainty; and (5) the time between the crime and the confrontation. *See Harmon*, 2011 OK CR 6, ¶ 45, 248 P.3d at 936.

to the verdict in this case and was harmless beyond a reasonable doubt.

### 5. Evidentiary Issues

 ¶ 30 Postelle argues that the district court erred in admitting Sandra Frame's identification of David Postelle and the testimony of Richard Vinson concerning a conversation he had with David Postelle about one of the victims. The purpose of this evidence, according to Postelle, was to establish his guilt by his association with his brother. Postelle contends that the testimony should have been excluded because it was irrelevant; and alternatively, if the evidence was somehow relevant, it should have been excluded because it was overly prejudicial. Postelle did not object to the testimony of either witness; review is for plain error only. *See Simpson v. State*, 2010 OK CR 6, ¶ 33, 230 P.3d 888, 900, *cert. denied*, —— U.S. ——, 131 S.Ct. 1009, 178 L.Ed.2d 838 (2011).

 ¶ 31 Relevant evidence is evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Taylor v. State*, 2011 OK CR 8, ¶ 40, 248 P.3d 362, 375–76; 12 O.S.2001, § 2401. "Relevant evidence need not conclusively, or even directly, establish the defendant's guilt; it is admissible if, when taken with other evidence in the case, it tends to establish a material fact in issue." *Taylor*, 2011 OK CR 8, ¶ 40, 248 P.3d at 376. Relevancy and materiality of evidence are matters within the sound discretion of the trial court. *Id.* Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or needless presentation of cumulative evidence. *Grissom v. State*, 2011 OK CR 3, ¶ 59, 253 P.3d 969, 989–90, *cert. denied*, —— U.S. ——, 132 S.Ct. 825, 181 L.Ed.2d 534 (2011); 12 O.S.Supp.2003, § 2403.

¶ 32 Sandra Frame's identification of David Postelle as the passenger in the maroon minivan that she observed leaving the crime scene was relevant to establishing the identity of the perpetrators of the murders. Other witness testimony placed Postelle and his brother in the same van shortly before and after the murders with the murder weapons. Frame's testimony tended to prove and partially corroborate Byus's testimony that it was Gilbert, David and Brad with him in the van at the crime scene. Frame's testimony was probative of the identity of the perpetrators and was more probative than prejudicial in this case. Postelle has not shown that its admission was plain error.

¶ 33 The testimony of Richard Vinson was properly admitted. Vinson testified that David Postelle came to his shop a month before the murders and that David said he was angry with Donnie Swindle because some car parts had been stolen from the Postelles' car while it was stored on Swindle's property. Although it appears Gilbert Postelle was not present during this conversation, other testimony from Sanders and Pino Georgio Amico confirmed that both of the Postelle brothers were angry with Swindle about the car being vandalized. Vinson's testimony was probative of motive for the killings and explained how the Postelle brothers' anger over the stripped car may have contributed to Swindle being targeted. The testimony was relevant and any danger of unfair prejudice was outweighed by its probative value. There was no error here.

### 6. Photographs

 ¶ 34 Postelle argues that the district court erred and denied him the right of confrontation by excluding the in-life photograph of Donnie Swindle offered by the defense during the first-stage of trial. The prosecution, without objection, called a relative of each of the victims in the first-stage of trial to sponsor an in-life photograph of their loved one (State's Exhibits 11–14). *See* 12 O.S.Supp.2003, § 2403 (in homicide prosecutions, prosecutor may admit "appropriate photograph of the victim while alive" to show the victim's "general appearance and condition" while alive). James Swindle, Donnie Swindle's father, identified a photograph of his son and stated that the photograph was eight to ten years old. He admitted that his son had an ongoing methamphetamine problem at the time of his death. Defense coun-

sel sought on cross-examination to introduce a booking photograph of Donnie Swindle from an arrest five months before his murder. (Defendant's Exhibit 23) The defense argued that this photograph more accurately depicted Swindle and his condition as a methamphetamine addict near the time of his death. The district court sustained the prosecutor's objection and excluded the photograph. The district court noted that evidence that a murder victim had prior drug convictions, that he had repeated problems with law enforcement or that he had drugs in his home at the time of his death is inadmissible in the first-stage of trial.[17]

¶ 35 We review a district court's decision to admit or exclude evidence for an abuse of discretion. *See Underwood v. State*, 2011 OK CR 12, ¶ 45, 252 P.3d 221, 242. In *Marquez–Burrola v. State*, 2007 OK CR 14, ¶ 31, 157 P.3d 749, 760, the appellant argued that 12 O.S.Supp.2003, § 2403 was facially unconstitutional because it permitted only prosecutors, not defendants, to offer photographs of a homicide victim. We rejected the claim, noting "[t]he statute does not expressly bar a defendant from introducing such evidence, and we find nothing in the more general provisions of the Evidence Code which would prevent him from doing just that, so long as the victim's appearance is somehow relevant to the issues in the case." *Id.*

¶ 36 The question presented is whether the photograph Postelle sought to admit of Swindle was relevant in first-stage. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." 12 O.S.2001, § 2401. There was no dispute that Donnie Swindle was murdered. The disputed issue in the first-stage of trial was who committed the murder and it was of no consequence whether Swindle was a community leader of

impeccable reputation or a methamphetamine addict. The in-life photograph Postelle sought to introduce had no tendency to shed any light on the real issue, namely the identity of Swindle's killer. Arguably, the photograph was relevant in second-stage and it and a photograph of Terry Smith were admitted depicting their appearance and condition near the time of their deaths. We find that the exclusion of the defense's photograph of Swindle in the first-stage of trial was neither an abuse of discretion nor a denial of Postelle's right of confrontation.

### 7. Instructional Errors

¶ 37 Postelle claims the district court erred in rejecting two of his proposed instructions in the first-stage of trial. First, he complains that the court erred in rejecting defense counsel's proposed instruction telling the jury that plea bargains involving the requirement of truthful testimony did not constitute vouching by the prosecution. This instruction was directed towards the testimony of Byus, Wilder, Sanders and Baumann.

¶ 38 Rulings on jury instructions are reviewed for an abuse of discretion. *See Harney v. State*, 2011 OK CR 10, ¶ 10, 256 P.3d 1002. 1005. This Court will not interfere with the trial court's judgment provided the instructions, as a whole, accurately state the applicable law. *Id.*

¶ 39 In *Nickell v. State*, 1994 OK CR 73, ¶¶ 7–10, 885 P.2d 670, 673–74, this Court considered whether evidence of a witness's obligation to testify truthfully as part of a plea agreement—so-called "truthfulness provisions"—constituted improper vouching of the witness's credibility. We held that evidence of truthfulness provisions in plea agreements becomes impermissible vouching only when a prosecutor explicitly or implicitly indicates that he or she can monitor and accurately verify the truthfulness of the witness's testimony. *Id.* at ¶ 8, 885 P.2d at 673.

17. Postelle seems to argue that the district court also erred in denying defense counsel's request to introduce Defendant's Exhibit 23 during Arthur Wilder's testimony. The record shows that defense counsel withdrew Defendant's Exhibit 23 in response to the prosecutor's objection, noting "we just want to have it identified for potential admission in Stage Two." Postelle's withdrawal of the exhibit constitutes abandonment of that request and waiver of the issue for appellate review regarding admission of the exhibit during the first-stage of trial. See *Johnson v. State*, 2004 OK CR 25, ¶ 15, 95 P.3d 1099, 1104.

"There is no improper vouching if the testimony does 'no more than reveal that the witnesses had an obligation to testify truthfully and explain the consequences of a breach of that obligation.'" *Id.* (*quoting United States v. Bowie*, 892 F.2d 1494, 1499). We relied in part on a federal case that likened the truthfulness provision in a plea agreement to the oath every witness takes before testifying. *Id.* at ¶ 9, 885 P.2d at 673–74. We agreed that neither the mere revelation of the obligation to testify truthfully nor the recognition of the consequences of testifying falsely does anything more than reiterate the obligation that all witnesses face when they take the oath at the beginning of their testimony. *Id.* at ¶ 9, 885 P.2d at 673–74. We noted that evidence of these provisions counter-balances the impeaching effect that a plea agreement has in the minds of the jury, but that it in no way removes the jury's duty to weigh the credibility of each witness. *Id.*

¶ 40 There was no improper vouching in this case. The prosecution elicited from each witness that the operative plea agreement was contingent upon full cooperation with the State and truthful testimony during the proceedings against Postelle. Nothing in the plea agreements or in the record indicates that the prosecutor explicitly or implicitly suggested that he had means to verify the truthfulness of the testimony of Byus, Wilder, Sanders or Baumann. The court properly instructed the jury on evaluating the credibility of witnesses. Because evidence of truthfulness provisions in a plea agreement does not constitute impermissible vouching and there was no impermissible vouching elsewhere in this trial, we find the court did not err in rejecting Postelle's proposed instruction on the subject.

■ ¶ 41 Postelle also argues that the court erred in rejecting his proffered jury instruction on reasonable doubt. We have consistently and repeatedly held that reasonable doubt is self-explanatory, and that rather than clarifying the meaning of the phrase, definitions of reasonable doubt tend to confuse the jury.[18] Postelle offers nothing new that warrants reconsideration of this settled issue. This claim is denied.

### 8. Jury Selection: Individual Questioning and Questionnaires

■■ ¶ 42 Postelle claims that the jury selection process in his case denied him due process. He complains about the "struck juror" method used in selecting jurors in this case.[19] He also argues that his inability to use jury questionnaires and to conduct individual sequestered *voir dire* about the death penalty denied him the ability to intelligently exercise his peremptory challenges to strike biased jurors.[20] He complains specifically that the district court judge did not permit individual questioning of jurors, but allowed only *en masse* questioning of the group. According to Postelle, this was a superficial mode of examining jurors that provided little information about individual jurors and necessitated the need for either individual ques-

---

18. *See Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 62, 241 P.3d at 234 (declining to revisit settled issue of whether jury should receive instruction on reasonable doubt) and cases cited therein.

19. Under the district court's "struck juror" method, thirty prospective jurors were called to be questioned by the court and the attorneys. As potential jurors were removed for cause, they were replaced until there was a panel of thirty potential jurors who were passed for cause by the parties. The parties then utilized nine peremptory challenges each, leaving twelve jurors to hear the case.

20. Postelle filed a pre-trial motion for the use of jury questionnaires with a proposed questionnaire, and for individual sequestered *voir dire* on the death penalty and pretrial publicity. The district court denied Postelle's motion to use

questionnaires, but granted Postelle's request for individual *voir dire* on the death penalty and pretrial news coverage. On the first attempt to hold a trial in this case, the district court utilized individual *voir dire* during that portion of jury selection relating to death qualification and pretrial publicity. That trial ended in mistrial before a jury was impaneled. The district court decided not to utilize individual *voir dire* in this trial which resulted in the convictions and death sentences presently under review. Postelle states in his brief that the request for sequestered *voir dire* was renewed during jury selection, but the passage cited, as well as the overall record, does not show that trial counsel renewed objections to the absence of individual *voir dire* or jury questionnaires.

tioning or questionnaires. He further complains that placing thirty potential jurors in the courtroom for *voir dire* examination, created uncomfortable conditions for the jurors and an atmosphere not conducive to discovering bias, interest, or partiality.

¶ 43 The purpose of *voir dire* examination is to discover whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges. *Sanchez v. State*, 2009 OK CR 31, ¶ 44, 223 P.3d 980, 997, *cert. denied*, —— U.S. ——, 131 S.Ct. 326, 178 L.Ed.2d 212 (2010). "The manner and extent of *voir dire* lies within the District Court's discretion." *Id.* Postelle did not object to the "struck juror" method of selecting jurors in his case, waiving review for all but plain error. *See Harmon*, 2011 OK CR 6, ¶ 12, 248 P.3d at 928; *Simpson*, 1994 OK CR 40, ¶ 23, 876 P.2d at 698. "The 'struck juror' method of jury selection has been upheld where the record shows that the defendant was provided 'the opportunity to examine each prospective juror to determine whether grounds existed to challenge the juror for cause and was allowed to exercise all of his peremptory challenges provided by law.' " *Harmon*, 2011 OK CR 6, ¶ 12, 248 P.3d at 928 (*quoting Jones*, 2006 OK CR 5, ¶ 8, 128 P.3d at 533). The record shows that Postelle's attorney was allowed to question all potential jurors broadly. We cannot agree that the district court's method of conducting *voir dire* of this large group was either clearly erroneous or manifestly unreasonable. *See Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 55, 241 P.3d at 233. Hence, Postelle has shown neither that the "struck juror" method affected his substantial rights nor that he was prejudiced by the method of jury selection employed in his case. *See Harmon*, 2011 OK CR 6, ¶ 12, 248 P.3d at 929.

¶ 44 Nor do we find that jury selection was unfair because the trial court chose not to conduct individual sequestered *voir dire*. We have left the decision regarding individual *voir dire* to the discretion of the district court and have rejected requests for a mandatory rule requiring the use of individual sequestered *voir dire* in capital cases. *See Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 57, 241 P.3d at 233; *Jones v. State*, 2006 OK CR 17, ¶ 16, 134 P.3d 150, 156; *Childress v. State*, 2000 OK CR 10, ¶ 40, 1 P.3d 1006, 1015 (use of individual *voir dire* discretionary with trial court). Individual sequestered *voir dire* is appropriate in certain cases, particularly in those that have been the subject of extensive pretrial news coverage, where the record shows that jurors were not candid in their responses about the death penalty or where it appears that prospective jurors' responses were tailored to avoid jury service. *See e.g., Harmon*, 2011 OK CR 6, ¶ 13, 248 P.3d at 929; *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 57, 241 P.3d at 233. "The crux of the issue, however, is whether the defendant can receive a fair trial with fair and impartial jurors." *Harmon*, 2011 OK CR 6, ¶ 13, 248 P.3d at 929; *Childress*, 2000 OK CR 10, ¶ 40, 1 P.3d at 1015.

¶ 45 Postelle cites remarks from several potential jurors exposed to news stories about the murders to argue that it was error not to conduct individual *voir dire* and not to allow questionnaires. The district court judge questioned these panelists to ensure that no one had formed an opinion about Postelle's guilt based upon what they had seen on the news. We give great deference to the district court's opinion of the candor of potential jurors because the judge sees the potential jurors and hears their responses. *Id.* at ¶ 14, 248 P.3d at 929. The trial judge in this case observed the potential jurors exposed to pretrial news coverage. The answers they gave concerning the news stories they had seen did not establish a need for further sequestered individual questioning. Our review shows that the remarks of these panelists contained nothing prejudicial that could have tainted the other potential jurors who heard them. The district court's decision not to conduct individual *voir dire* was not an abuse of discretion.

¶ 46 Nor can we find that the district court's decision denying the use of a jury questionnaire in this case amounted to an abuse of discretion. While the use of jury

questionnaires is not required.[21] we have noted their value as a screening tool in capital cases. *See Harmon*, 2011 OK CR 6, ¶ 15, 248 P.3d at 929; *Eizember v. State*, 2007 OK CR 29, ¶ 40 n. 6, 164 P.3d 208, 221 n. 6. In this case, however, defense counsel was allowed to thoroughly question prospective jurors about their views on the death penalty and other relevant issues for the purpose of challenging prospective jurors for cause and intelligently exercising peremptory challenges. Significantly, Postelle does not identify any specific question he would have asked on a questionnaire that he did not ask, or could not have asked, during oral *voir dire*. We cannot find, therefore, that Postelle's constitutional right to due process was violated by the lack of juror questionnaires in the *voir dire* process.

### 9. Jury Selection: Erroneous Removal of Panelists for Cause Based on Opposition to the Death Penalty

¶ 47 Postelle claims that the district court failed to follow the proper procedure in excusing eight panelists for cause based upon the panelists' views on the death penalty. He argues that the district court judge did not ask the proper questions of potential jurors and that the judge should have given his attorney a chance to question panelists before they were excused based upon their expressed opposition to the death penalty.

¶ 48 A prospective juror must be excused for cause in a capital case when the panelist's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). "Due process of law requires that a prospective juror be willing to consider all the penalties provided by law and not be irrevocably committed to a particular punishment before the trial begins." *Sanchez*, 2009 OK CR 31, ¶ 44, 223 P.3d at 997. Under the *Witt* standard, however, the juror's bias need not be proven with unmistakable clarity; nor does it require that the juror express an intention to vote against the death penalty automatically. *Witt*, 469

U.S. at 424, 105 S.Ct. at 852. "[D]eference must be paid to the trial judge who sees and hears the jurors." *id.*, 469 U.S. at 426, 105 S.Ct. at 853; *see also Miller–El v. Cockrell*, 537 U.S. 322, 339, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) ("Deference [on jury-selection issues] is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court to make credibility determinations."); *Grant v. State*, 2009 OK CR 11, ¶ 17, 205 P.3d 1, 11, *cert. denied*, — U.S. ——, 130 S.Ct. 404, 175 L.Ed.2d 276 (2009) (deference to the trial court is appropriate because the court is able to personally observe the panelists, and take into account a number of non-verbal factors that do not transfer well, if at all, to the transcript page).

¶ 49 *Witt* requires only that each juror be willing to consider each of the three statutory punishments: the death penalty, life imprisonment without the possibility of parole and life imprisonment with the possibility of parole. *Hogan v. State*, 2006 OK CR 19, ¶ 17, 139 P.3d 907, 918. "We review a juror's *voir dire* examination in its entirety to determine if the trial court properly excused the juror for cause." *Harmon*, 2011 OK CR 6, ¶ 19, 248 P.3d at 930.

¶ 50 The eight prospective jurors identified by Postelle were all examined by the district court judge. Each of them stated unequivocally that under no circumstances could he or she give meaningful consideration to the three penalties provided by law. The district court followed up on any response that could be construed as equivocal for assurance that the prospective juror could not follow the law. In the end, each panelist informed the court that he or she would not consider all three penalties regardless of the law and evidence.

¶ 51 A review of *voir dire* shows that the district court neither erred in denying defense counsel's request to further question these panelists nor erred in its questioning. "Where the trial court has appropriately questioned prospective jurors regarding their eligibility to serve on a capital jury, it is not

---

**21.** *See* Notes on Use to OUJI–CR(2d) 1–10 (use of juror questionnaire is discretionary).

error to deny defense counsel a chance to rehabilitate jurors excused for inability to impose the death penalty." *Coddington v. State*, 2011 OK CR 17, ¶ 10, 254 P.3d 684, 695; *Littlejohn v. State*, 2004 OK CR 6, ¶ 49, 85 P.3d 287, 301–02.

¶ 52 The district court judge used an older version of the qualifying question for a capital case juror with Panelist G. When the mistake was brought to his attention, he substituted the question prescribed by OUJI–CR(2d) 1–5 for qualifying capital case jurors. The judge informed the panelists of the jury's duty to assess guilt and, if necessary, punishment, the three punishment options, the meaning of aggravating and mitigating circumstances, and the requirement of weighing aggravating and mitigating circumstances.[22] He then asked each panelist if he or she could consider the three penalties provided by law and impose the punishment warranted by the law and evidence. If the panelist said "no," the judge asked if the panelist's reservations were so strong that regardless of the law and evidence, the panelist could not consider all three penalties. The court's question about the panelist's willingness to consider the three penalties was taken nearly verbatim from OUJI–CR(2d) 1–5 and was sufficient to identify those panelists who could not or would not consider the three punishments no matter what the law or facts.[23] *See Harmon*, 2011 OK CR 6, ¶ 22, 248 P.3d at 931; *Williams v. State*, 2001 OK CR 9, ¶ 13, 22 P.3d 702, 710. Based on this record we find the district court did not abuse its discretion in removing the eight challenged panelists for cause.

### 10. Jury Selection: Implied Bias and 22 O.S.2001 § 660(8)

¶ 53 Postelle claims that it is a violation of 22 O.S.2001, § 660 to remove a prospective juror for cause based on the panelist's opposition to the death penalty because Section 660(8) allows for the removal of only those panelists whose views on capital punishment would prevent them from finding the

---

22. OUJI–CR(2d) 1–5 provides:

The defendant is charged with murder in the first degree. It will be the duty of the jury to determine whether the defendant is guilty or not guilty after considering the evidence and instructions of law presented in court.

If the jury finds beyond a reasonable doubt that the defendant is guilty of murder in the first degree, the jury will then have the duty to assess punishment. The punishment for murder in the first degree is death, imprisonment for life without parole or imprisonment for life. You may not consider imposing the death penalty unless you find that one or more aggravating circumstances exist beyond a reasonable doubt. Aggravating circumstances are those which increase the defendant's guilt or enormity of the offense. You also may not consider imposing the death penalty unless you unanimously find that the aggravating circumstance or circumstances outweigh any mitigating circumstances which may be present. Mitigating circumstances are 1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty. Even if you find that the aggravating circumstance(s) outweigh(s) the mitigating circumstance(s), you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole.

If you find the defendant guilty of murder in the first degree, can you consider all three of these legal punishments—death, imprisonment for life without parole or imprisonment for life—and weigh the aggravating circumstance(s) against the mitigating circumstances to impose the punishment warranted by the law and evidence? **[If the answer to the preceding question is negative]** If you found beyond a reasonable doubt that the defendant was guilty of murder in the first degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of **death/(imprisonment for life without parole)/(imprisonment for life),** are your reservations about the penalty of **death/(imprisonment for life without parole)/(imprisonment for life)** so strong that regardless of the law, the facts and circumstances of the case, you would not consider the imposition of the penalty of **death/(imprisonment for life without parole)/ (imprisonment for life)?**

23. Even though the court used a former version of OUJI–CR(2d) 1–5 in questioning Panelist G, the questioning sufficiently probed the issue of whether Panelist G was able to consider the three penalties provided by law. Panelist G was firm that he could not consider the death penalty and the judge found that further questioning was unnecessary because he was "pretty emphatic about it."

defendant guilty.[24] The misapplication of the implied bias statute, he maintains, allows the automatic removal for cause of those jurors who are not death-penalty prone rather than requiring the State to exercise peremptory challenges to exclude them. Hence, argues Postelle, the State receives more strikes under our capital jury selection system than it is entitled to, resulting in juries prone to imposing the death penalty. We have rejected this same argument in two recent cases. *See Coddington,* 2011 OK CR 17, ¶¶ 14–15, 254 P.3d at 696–97; *Harmon,* 2011 OK CR 6, ¶ 23, 248 P.3d at 931. Postelle offers no new authority or argument warranting reconsideration of this claim and it is denied.

### 11. Lecture

¶ 54 Postelle claims that the district court judge made numerous improper comments during a "lecture" in *voir dire* that denied him due process and a fundamentally fair trial. Among other things, Postelle complains that the trial court judge gave instructions during *voir dire* that were designed to encourage jurors to abandon their own beliefs to reach a verdict and that these instructions had a coercive effect on the jury. He argues that the court's remarks were often biased in favor of the prosecution, diminished his presumption of innocence and were confusing and prejudicial. Because Postelle did not object to the remarks, we review for plain error. *See McElmurry v. State,* 2002 OK CR 40, ¶ 26, 60 P.3d 4, 16–17 (holding that objections to nature or extent of *voir dire* not made before start of testimony are waived except for plain error).

¶ 55 "An important aspect of *voir dire* is to educate prospective jurors on what will be asked of them under the law." *Eizember,* 2007 OK CR 29, ¶ 40, 164 P.3d at 221. A trial court, however, must not influence jurors in their decision-making process. *Johnson v. State,* 2009 OK CR 26, ¶ 4, 218

P.3d 520, 522. The Oklahoma Uniform Jury Instructions–Criminal (2d) are comprehensive instructions that follow a chronology designed to give jurors as much information as they need about the trial proceedings. Trial courts should follow the introductory information provided in the Oklahoma Uniform Jury Instructions. If the court determines that jurors should be instructed on a matter not included within the Uniform Jury Instructions, the court should give an instruction that is "simple, brief, impartial and free from argument." 12 O.S.2001, § 577.2. Analogies and examples may be used to illustrate the uniform opening instructions, but trial courts should be objective and careful not to appear to guide the jury to a particular decision. *Johnson,* 2009 OK CR 26, ¶ 4, 218 P.3d at 522.

¶ 56 In *Johnson,* 2009 OK CR 26, ¶ 5, 218 P.3d at 522, reversal was required because the court's remarks emphasized the potential cost of the proceedings and potential consequences of the jurors' failure to follow the court's instructions. The court's remarks in *Johnson* about the deliberation process were premature and amounted to a preemptive deadlocked jury charge. *Id.*

¶ 57 The remarks in Postelle's case are nothing like those condemned in *Johnson.* The trial court judge discussed neither the costs of the proceedings nor the ramifications of failing to follow the court's instructions. The court's commentary that was in addition to the material in the uniform instructions focused on the presumption of innocence, the burden of proof and some procedural aspects of the deliberation process. Contrary to Postelle's claim, the court's remarks concerning deliberations—that the jury would not be allowed to communicate with outsiders or separate until a verdict was reached—did not compel jurors to hastily return a guilty verdict.[25] The court emphasized that there was

---

24. Section 660 provides:

A challenge for implied bias may be taken for all or any of the following cases, and for no other ...
8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty of, in which case he shall

neither be permitted nor compelled to serve as a juror.

25. The remarks in this case are also not like the ones that necessitated relief recently in *Bills v. State,* Case No. F–2009–404, unpublished (May 4, 2011). In *Bills,* the judge tried to instruct the jury on how to avoid deadlock during *voir dire,* similar to a so-called *"Allen charge,"* known as

no time limitation on deliberations and that meals, if necessary, would be provided. Never did the trial court tell prospective jurors what verdict they should reach. Nor does our review of the record support Postelle's claim that the court's remarks somehow skewed deliberations in favor of the prosecution or otherwise undermined the presumption of innocence. The court's comments were accurate statements of the law that were neither coercive nor encouraged jurors to abandon their personal beliefs to reach a verdict. This claim is denied.

### 12. Constitutionality of Death Penalty: Proportionality Review

¶ 58 Postelle contends that Oklahoma's capital sentencing scheme is unconstitutional because this Court's appellate review does not include proportionality review. He claims that his case shows that death sentences in Oklahoma are imposed arbitrarily and capriciously because his brother received a sentence less than death based on almost identical evidence in both stages of trial.[26] To bolster this claim, Postelle cites the American Law Institute's position that the death penalty cannot be fairly administered.

¶ 59 The Supreme Court's Eighth Amendment jurisprudence has required that a state's capital sentencing scheme channel the sentencer's discretion by clear and objective standards that provide specific, detailed guidance and make the death sentencing process rationally reviewable on appeal. *Sanchez,* 2009 OK CR 31, ¶ 82, 223 P.3d at 1007. In *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Supreme Court concluded that "[t]here is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it." *Id.* at 50–51, 104 S.Ct. at 879. In *Battenfield v. State,* 1991 OK CR 82, ¶ 27, 816

P.2d 555, 563–64, we held that barring a statutory mandate, this Court need not conduct a proportionality review in capital cases.

¶ 60 To ensure the reliability of death verdicts, this Court is charged with conducting a mandatory review of every death sentence imposed to determine: 1) whether the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor; and 2) whether sufficient evidence was presented to support the jury's finding of statutory aggravating circumstances. 21 O.S.2001. § 701.13(C). This mandatory sentence review, as well as other procedural safeguards, provides a mechanism for meaningful appellate review to ensure that death sentences are not a product of arbitrary sentencing. The record before us shows that Postelle's jury was properly instructed on the statutory aggravating circumstances alleged in this case. The capital jury instructions provided that Postelle's jury could not consider the death penalty unless it unanimously found at least one aggravating circumstance beyond a reasonable doubt. Postelle's jury was further instructed that a death penalty verdict is *never* required, even where the balance of aggravating and mitigating factors may fully justify it. It is apparent that Postelle's jury understood and followed these instructions because, despite finding the existence of two aggravating circumstances on each of the four murder counts, it imposed the death penalty on only two of those counts.

¶ 61 Postelle was constitutionally entitled to a determination of his individual culpability and he received that individualized consideration. The Constitution does not demand that he receive a review of his comparative responsibility as well. *Accord United States v. Barrett,* 496 F.3d 1079, 1109 (10th Cir. 2007) (Eighth Amendment does not require state courts to conduct proportionality review

---

the Deadlocked Jury Charge at Instruction No. 10–11 OUJI–CR(2d). The trial court's *voir dire* comments in *Bills* urging jurors to reach a verdict quickly and urging jurors in the majority to reel in individual jurors whose views were impeding a decision was a misstatement of the law and was an inherently coercive intrusion into the deliberative process. No comparable comments were made in Postelle's case.

**26.** This Court notes that the evidence admitted against Postelle was not "almost identical" to the evidence against his brother because co-defendant Randall Byus did not testify at David Postelle's trial.

of a death sentence); *Pickens v. Lockhart,* 4 F.3d 1446, 1454 n. 4 (8th Cir.1993) ("Comparative proportionality review of death sentences is not constitutionally required."); *Brogdon v. Blackburn,* 790 F.2d 1164, 1170 (5th Cir.1986) ("A State need not even undertake any sort of proportionality review of death sentences so long as the underlying sentencing scheme minimizes arbitrary and capricious sentencing."); *Roach v. Martin,* 757 F.2d 1463, 1482 (4th Cir.1985) (holding that "a comparative [proportionality] review is not constitutionally mandated"). Oklahoma's capital sentencing scheme channels the jury's discretion by clear and objective standards. We find that these procedural safeguards give capital defendants the necessary ineprotection from wholly arbitrary sentencing and that Oklahoma's capital sentencing scheme passes constitutional muster.[27]

### 13. Constitutionality of the Death Penalty: *Furman v. Georgia*

¶ 62 Postelle continues his claim that his death sentences are unconstitutional and should be set aside. He maintains that his death sentences are disproportionate to those of his equally culpable co-defendants and that the disparity in the sentences of the co-defendants in his case shows that Oklahoma applies the death penalty in a manner that does not comport with the constitutional mandate of consistent, evenhanded application set out in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). To support the notion that the death penalty was imposed arbitrarily in this case, Postelle provides his view on the relative culpability of his co-defendants and the subsequent outcome of their cases. He asks the Court to modify his two death sentences to life in prison to reflect his level of culpability in comparison to the other, older and more mature participants, under whose direction he was operating.

¶ 63 As discussed in Section 12 above, proportionality review is not constitutionally required. For the reasons explained in Section 12, the constitutionality of Postelle's death sentences is not in doubt given the safeguards in Oklahoma's capital sentencing scheme that were well observed in Postelle's case. We further note that the evidence presented against Postelle was different in significant ways from the evidence presented against his brother, David Postelle, the only other co-defendant to go to trial. Co-defendant Randall Byus did not testify at David Postelle's trial and it was not until after David's trial that Byus struck a deal with the State and agreed to cooperate. During Gilbert Postelle's trial, Byus supplied a firsthand account of the quadruple homicide for the jury that was not available to his brother's jury. Byus's testimony established that Postelle was more culpable than his brother or the other co-defendants in the commission of the murders. According to Byus, Postelle initiated the attack by opening the van door and immediately shooting Terry Smith in the head. Byus testified that Postelle participated in the murder of Donnie Swindle and then personally chased down and alone murdered James Alderson and Amy Wright as they attempted to flee. The testimony of Randall Byus provided a rational basis upon which Postelle's jury could find him more culpable than his co-defendants.

¶ 64 Furthermore, this Court has found that an accomplice's lesser sentence or immunity from prosecution does not render a defendant's sentence excessive and is not proof of error. *See Wackerly,* 2000 OK CR 15, ¶ 48, 12 P.3d 1, 15, *Romano,* 1995 OK CR 74, ¶ 65, 909 P.2d 92, 117. Postelle's jury was fully aware during the second-stage of trial of the circumstances of Byus's plea agreement and so was able to evaluate his credibility about the relative culpability of those involved. The competency or trial status of co-defendant, Brad Postelle, Postelle's

---

**27.** Postelle's reliance on the American Law Institute's stance on the death penalty is not unlike earlier arguments urging this Court to adopt the resolution of the American Bar Association recommending a moratorium on the imposition of the death penalty. We consistently rejected this position, noting that Oklahoma's death penalty statutes have been repeatedly upheld as constitu- tional. *See Martinez v. State,* 1999 OK CR 47, ¶ 27, 992 P.2d 426, 432; *Alverson v. State,* 1999 OK CR 21, ¶ 58, 983 P.2d 498, 517. This argument is a policy-type argument which is best directed to the legislature. *See Hogan v. State,* 2006 OK CR 19, ¶ 82, 139 P.3d 907, 934 (policy matters fall within the purview of the legislature and not the courts).

father, was not relevant to the jury's second-stage evaluation of Postelle's character, his record or the circumstances of the offense. *See Harris v. State*, 2007 OK CR 28, ¶ 24, 164 P.3d 1103, 1113. The defense presented evidence of Postelle's age relative to his co-defendants, as well as his alleged mental deficits from years of drug abuse, as mitigating evidence for the jury's consideration. The defense portrayed Gilbert Postelle as a young man who was at the mercy of his older co-defendants and who was so desperate for his father's affection that he would kill for his father to gain love and approval. The defense emphasized that Byus had much to gain from his testimony and pointed out the inherent unfairness in young Gilbert Postelle facing the death penalty while the older, more mature Byus—who did and said nothing to stop his friend Brad Postelle from carrying out the plot to murder Swindle—would spend little time in prison. The defense also asked the jury to consider the minor sentences received by others involved, including Sanders, Wilder and Baumann. The defense put forth every reason to spare Postelle's life, emphasizing his limited mental faculties and his firm, albeit misguided, desire to avenge and please his father. The jury weighed the evidence under proper instruction and imposed punishment. We find on this record that the death sentences imposed are valid and were not the result of arbitrary or capricious action.

### 14. Mitigating Evidence: David Postelle's Sentence

¶ 65 Postelle argues that it was error to exclude David Postelle's Judgment and Sentence for the murders and to prevent the jury from considering, as a mitigating circumstance, the fact that David Postelle was sentenced to life imprisonment without the possibility of parole. According to Postelle, the fact that other equally culpable co-defendants have not been sentenced to death falls within the purview of mitigating circumstances. That circumstance, he claims, is one which in fairness, sympathy or mercy may lead a jury to impose a sentence less than death.

¶ 66 The leading case from the United States Supreme Court on the issue of what constitutes mitigating evidence that the defense must be permitted to present to the jury in a death penalty case is *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The *Lockett* Court held that the sentencer must be permitted to consider "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense." *Id.*, 438 U.S. at 604, 98 S.Ct. at 2964 (emphasis in original).

¶ 67 In *Harris*, we explained:

A capital defendant "must be allowed to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense." "It is settled that a defendant may present in mitigation any aspect of his record or character, and any circumstances of the crime that could possibly convince a jury that he is entitled to a sentence less than death. Likewise, a defendant is also entitled to present any evidence that may assist in rebutting an aggravating circumstance." When considering whether to recommend the death penalty, jurors must look at both the circumstances of the crime and the personal characteristics and propensities of the defendant.

*Harris*, 2007 OK CR 28, ¶ 24, 164 P.3d at 1113 (citations and footnotes omitted).

¶ 68 Courts are divided on whether the admission of evidence concerning the disposition of a co-defendant's case is relevant mitigating evidence. *Compare Ex parte Burgess*, 811 So.2d 617, 628 (Ala.2000) (the lenient treatment of accomplices was appropriate mitigating factor that trial court should have given greater weight), *State v. Ferguson*, 642 A.2d 1267, 1269 (Del.Super.1992) (the disposition of co-defendants' cases is relevant, mitigating evidence), and *State v. Marlow*, 163 Ariz. 65, 786 P.2d 395, 402 (1989) (disparity between sentences of accomplices must be considered and may be found a mitigating circumstance and weighed against any aggravating circumstances in determining whether to impose death penalty), *with People v. Moore*, 51 Cal.4th 1104, 127 Cal.Rptr.3d 2, 253 P.3d

1153, 1181 (2011) (evidence concerning co-participants' sentences is properly excluded from penalty phase of capital trial because such evidence is irrelevant), *Meyer v. Branker*, 506 F.3d 358, 375–76 (4th Cir.2007) (constitution does not mandate admission of co-perpetrator's sentence under *Lockett* and progeny), *Saldano v. State*, 232 S.W.3d 77, 100 (Tex.Crim.App.2007) (evidence of co-defendant's conviction and punishment is not mitigating evidence that defendant has a right to present because the evidence does not relate to the defendant's own circumstances), *Commonwealth v. Williams*, 586 Pa. 553, 896 A.2d 523, 524 (2006) (rejecting argument that criminal disposition of defendant's cohorts has any relevance in mitigation to defendant's own punishment), *Beardslee v. Woodford*, 358 F.3d 560, 579 (9th Cir.2004) (trial court does not commit constitutional error under *Lockett* by excluding evidence of co-defendants' non-capital sentences), and *Brogdon v. Blackburn*, 790 F.2d 1164, 1169 (5th Cir.1986) (*Lockett* does not require trial court to allow capital defendant to introduce evidence not relevant to his character, prior record or circumstances of his offense; evidence of co-defendant's life sentence is relevant only to task of comparing proportionality of defendant's sentence to sentences of others similarly situated, a function assigned by statute to Louisiana Supreme Court).

¶ 69 We recognize that there is a "low threshold for relevance" applicable to mitigating evidence in capital cases. *Tennard v. Dretke*, 542 U.S. 274, 284, 124 S.Ct. 2562, 2570, 159 L.Ed.2d 384 (2004) (meaning of "relevance" is no different in context of mitigating evidence introduced in capital sentencing proceeding than in any other context). Relevant mitigating evidence tends logically to prove or disprove some fact or circumstance that a fact-finder could reasonably deem to have mitigating value. *Id.* Under *Lockett*, the proffered evidence, however, must necessarily relate to the defendant's personal circumstances, *i.e.*, his character, record or circumstance of the offense.

¶ 70 The district court found that the sentence received by David Postelle was not relevant and that there was evidence showing

that Postelle was "by far the most culpable and participated to a larger degree than any of the other charged individuals." Postelle was permitted to present mitigating evidence concerning his character and record, as well as evidence rebutting the aggravating circumstances. The jury examined the evidence and sentenced Postelle to death on the two murder counts where the evidence showed Postelle pursued James Alderson and Amy Wright by himself and shot them as they tried to run away or seek cover. Although a trial court is not necessarily precluded from allowing consideration of co-defendant sentences, we find that the district court did not commit constitutional error under *Lockett* by refusing to allow evidence of David Postelle's sentence in this case.

**15. Mitigating Evidence: Videotapes**

¶ 71 Postelle argues that the district court erred in excluding three videotape clips that he sought to introduce as mitigating evidence during the penalty phase. The first video clip shows Postelle and his brother as children roller skating in front of their grandfather. The second video clip shows a "young," "healthy," "fit" Brad Postelle before his motorcycle accident "being silly for the camera." And the third video clip shows a frail and weak Brad Postelle after his motorcycle accident and the murders, stating that he loves and misses his sons. (Court's Exhibit 11) The State objected to the video clips on relevancy grounds, arguing that the clips did not extenuate or reduce the moral culpability of Postelle. The district court relied on *Fox v. State*, 1989 OK CR 51, ¶¶ 42–44, 779 P.2d 562, 572, and excluded the video clips as cumulative after defense counsel acknowledged that she would be calling family members to testify about the relationship Postelle had with his grandfather and father.

¶ 72 "The sentencer in capital cases should not be precluded from considering any relevant mitigating evidence." *Coddington v. State*, 2006 OK CR 34, ¶ 90, 142 P.3d 437, 460, (citing *Skipper v. South Carolina*, 476 U.S. 1, 8, 106 S.Ct. 1669, 1673, 90 L.Ed.2d 1 (1986)). In *Fox*, this Court held that the trial court's exclusion of five affidavits from people unable to attend trial was

not error. *Fox,* 1989 OK CR 51, ¶¶ 42–44, 779 P.2d at 572. The affiants therein stated that the defendant's life had meaning and asked the jury to spare his life. *Id.* at ¶ 42, 779 P.2d at 572. This Court found that the affidavits were cumulative to the testimony of the fifty-four live witnesses who testified and made pleas for mercy and that the affidavits were therefore properly excluded under 12 O.S., § 2403. *Id.* at ¶ 44, 779 P.2d at 572. The *Fox* court noted that the excluded mitigating evidence was not "exclusive to the particular affiants" as was the excluded testimony that required relief in *Skipper v. South Carolina. Id.*

¶ 73 In *Coddington,* 2006 OK CR 34, ¶ 77, 142 P.3d at 457–58, we found that it was error to exclude the videotaped statement of the defendant's mother. The State objected to the admission of the videotape because the statement was not taken in strict compliance with the applicable statute. The district court ultimately excluded the videotape and allowed only the testimony of the defendant's mother to be read into the record. We held that the exclusion of the videotape in its entirety based on strict adherence to the rules of evidence and to the procedures outlined in 22 O.S.2001, §§ 781 *et. seq.* deprived the defendant of due process of law and a reliable capital sentencing hearing. *Coddington,* 2006 OK CR 34, ¶ 81, 142 P.3d at 458. We noted "a compelling difference between seeing the witness testify to this valuable mitigation evidence and hearing someone read her testimony." *Id.* at ¶ 81, 142 P.3d at 458. This was because the "videotaped examination showed her demeanor—it showed her distress and sadness she had for her son in a way that the cold reading of a transcript [of her testimony] could not portray." *Id.* at ¶ 90, 142 P.3d at 460.

 ¶ 74 This Court finds that this case is more like *Fox* than *Coddington.* Through live testimony, family members explained Postelle's relationships with his father and grandfather. They described the respect and admiration he had for both men and how he cared for his father after his motorcycle accident and for his grandfather after a stroke. Photographs of Postelle's grandfather before and after his stoke were admit-

ted. Photographs of Postelle's father before the motorcycle accident were also admitted, and his condition after the accident was described by many. The proffered video clips do not show Postelle interacting with his father at all and show only momentary interaction with his grandfather. The substance of the mitigating evidence that Postelle sought to reinforce through the three to four minutes of video clips was separately presented to his jury. Hence, we find that the district court did not abuse its discretion in excluding the video clips. *See Underwood,* 2011 OK CR 12, ¶ 45, 252 P.3d at 242 (holding decision to admit or exclude evidence is reviewed for abuse of discretion). We caution, however, that a ruling excluding mitigating evidence as "cumulative" is proper only to the extent that the ruling prevents needless presentation of cumulative evidence that would unnecessarily lengthen a trial. In a case like this one, where reversal is costly and the presentation of mitigating evidence adds no more than a few minutes to the proceedings, the better practice is to err on the side of admitting the proffered mitigating evidence.

### 16. Victim Impact Evidence

 ¶ 75 Postelle challenges the victim impact testimony of John Alderson and Janet Wright. He claims that their testimony focused almost exclusively on the emotional impact of their loved one's death and that this is the kind of testimony that undermines the jury's ability to make a reasoned moral response in assessing the death penalty.

¶ 76 The district court judge held a hearing outside the presence of the jury to consider the proposed victim impact evidence. The prosecutor informed the court that he had given copies of the proposed statements of these witnesses to defense counsel, that defense counsel had excised out objectionable material and that the State agreed with the redactions made by the defense. The prosecutor further advised that the redacted statements would be admitted without objection and defense counsel agreed. Postelle's failure to object limits our review to that of plain error only. *Murphy v. State,* 2002 OK CR 24, ¶ 42, 47 P.3d 876, 885.

¶ 77 Evidence about the victim, the physical effects of the crime on the victim, the circumstances surrounding the crime, the manner in which the crime was perpetrated and about the financial, emotional, psychological and physical impact of the murder on the victim's family is admissible. 22 O.S.2001, § 984; 21 O.S.2001, § 701.10(C). The challenged testimony in this case clearly related to the physical effects of the crime, the manner in which it was carried out, and the emotional and psychological impact of the murders of Alderson and Wright on their families. The victim impact evidence was concise and narrowly focused on the permissible subjects and was within the bounds of admissible victim impact testimony. The evidence did not unfairly prejudice Postelle or divert the jury from its duty to reach a reasoned moral decision regarding whether to impose the death penalty. Postelle has not shown that the admission of this victim impact evidence was error.

### 17. The Murder Was Especially Heinous, Atrocious or Cruel: Sufficiency of the Evidence

¶ 78 Postelle claims that the evidence was insufficient to prove beyond a reasonable doubt that the murders of James Alderson and Amy Wright were especially heinous, atrocious or cruel. This Court reviews the record to determine whether the evidence, considered in the light most favorable to the State, was sufficient for a rational trier of fact to find the aggravating circumstance beyond a reasonable doubt. *See Magnan v. State*, 2009 OKCR 16, ¶ 29, 207 P.3d 397, 407, *cert. denied*, —— U.S. ——, 130 S.Ct. 276, 175 L.Ed.2d 185 (2009).

¶ 79 A particular murder is especially heinous, atrocious or cruel where the evidence shows: (1) that the murder was preceded by either torture of the victim or serious physical abuse; and (2) that the facts and circumstances of the case establish that the murder was heinous, atrocious or cruel. *DeRosa v. State*, 2004 OK CR 19, ¶ 96, 89 P.3d 1124, 1156. The "term 'torture' means the infliction of either great physical anguish or extreme mental cruelty." *Id.* A finding of "serious physical abuse" or "great physical

anguish" requires that the victim have experienced conscious physical suffering prior to death. *Id.* "[T]he term 'heinous' means extremely wicked or shockingly evil; the term 'atrocious' means outrageously wicked and vile; and the term 'cruel' means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others." *Id.*

¶ 80 Postelle focuses on the short time frame in which the murders were committed and the rapidly fatal nature of Alderson's and Wright's wounds to support his argument that these murders were not especially heinous, atrocious or cruel. We disagree. According to Randall Byus, after Donnie Swindle and Terry Smith were shot in a barrage of semi-automatic gunfire, Postelle ran inside the trailer firing the MAK-90. Byus heard gunshots coming from inside the trailer, a fact confirmed by technical investigators. Tom Bevel, the State's crime scene reconstruction expert, testified that based upon the physical evidence, six shots were fired inside the trailer, but there was no evidence of blood.

¶ 81 Byus testified that Postelle chased Alderson to a boat near the steel corrugated fence that outlined the outer boundary of the salvage yard. Byus witnessed Postelle shoot Alderson, as Alderson was trying to crawl underneath a parked boat. Alderson's hands and clothing revealed the presence of gravel and grass and he had chipped and damaged fingernails with dirt underneath them. This was consistent with Alderson trying to escape by digging underneath the boat before being shot twice in the head from behind.

¶ 82 Byus testified that after witnessing Alderson's murder, he returned to the van and heard additional gunfire behind him. As the van started down the driveway, Postelle got in and said, "The bitch almost got away." Byus had not seen Amy Wright, but concluded later that Postelle was obviously referring to her. Wright's body was found face down in front of a parked car not far from Alderson's body. Her escape was cut off by the car and the corrugated metal boundary fence. Wright was barefoot, suggesting that she ran from the trailer in a desperate attempt to escape. Wright suffered three gun-

shot wounds to the head and lower back, all of which were fired from behind.

¶ 83 The record evidence supports the inference that Postelle chased Alderson and Wright from the trailer outside to the places where their bodies were ultimately found. Bevel testified that, based upon the physical evidence, this appeared to be a blitz-style attack. That Wright was found without shoes, combined with the absence of blood inside the trailer, supports the theory of a sudden, surprise attack that sent both her and Alderson out the back of the trailer, fleeing from gunfire after hearing the flurry of gunfire (some twenty-four shots) that resulted in the deaths of Swindle and Smith moments before. The evidence supports the reasonable inference that Wright and Alderson were aware of the attacks on Swindle and Smith and that they knew they were running for their lives when they were each shot and killed. "Evidence that the victim was conscious and aware of the attack supports a finding of torture." *Pavatt v. State,* 2007 OK CR 19, ¶ 75, 159 P.3d 272, 294. Furthermore, the anticipation of death caused by the knowledge that others around the victim are being shot is sufficient to support the mental anguish requirement of the aggravator. *See Jones v. State,* 2009 OK CR 1, ¶ 80, 201 P.3d 869, 889, *cert. denied,* — U.S. ——, 130 S.Ct. 237, 175 L.Ed.2d 163 (2009) (evidence sufficient to support aggravator where unarmed victim was fatally shot after witnessing the shooting of his friends and his sister); *Hancock v. State,* 2007 OK CR 9, ¶ 121, 155 P.3d 796, 824 (evidence sufficient to support aggravator where unarmed victim witnessed shooting of friend and was fatally shot while attempting to help friend); *Hamilton v. State,* 1997 OK CR 14, ¶ 56, 937 P.2d 1001, 1014 (evidence of aggravator held sufficient where four employees made to kneel while each one was systematically shot in head and died), *abro-gated on other grounds by, Alverson v. State,* 1999 OK CR 21, ¶ 83 n. 109, 983 P.2d 498, 521 n. 109. There was sufficient evidence for the jury to find beyond a reasonable doubt that the murders of Alderson and Wright were especially heinous, atrocious or cruel.

## 18. Constitutionality of Aggravating Circumstance

¶ 84 Postelle claims that the especially heinous, atrocious or cruel aggravating circumstance is unconstitutionally vague and overbroad. He maintains that this Court's attempts to limit and narrow this aggravating circumstance have been unsuccessful. This Court has rejected similar challenges to the constitutionality of this aggravating circumstance. *See, e.g., Harmon,* 2011 OK CR 6, ¶ 78, 248 P.3d at 943; *Cuesta–Rodriguez,* 2010 OK CR 23, ¶ 80, 241 P.3d at 238; *Thacker v. State,* 2004 OK CR 32, ¶ 26, 100 P.3d 1052, 1058 and cases cited therein. The analysis and authorities presented by Postelle raise nothing new. We continue to find that the instructions given regarding the especially heinous, atrocious or cruel aggravating circumstance sufficiently narrow its application to pass constitutional muster. This claim is denied.

## 19. Reconsideration of Previously Decided Issues

¶ 85 Postelle raises eight claims challenging various sentencing-phase jury instructions, the constitutionality of Oklahoma's death penalty scheme, and the manner in which the death penalty is carried out. All of these claims have been rejected by this Court.[28]

¶ 86 Postelle first challenges the sentencing-phase jury Instruction No. 53, as taken from Instruction No. 4–78, OUJI–CR(2d).[29] He argues that instructing the

28. We are aware that raising these settled issues will tend to prevent a finding of waiver in any subsequent state or federal proceedings in this case.

29. OUJI–CR(2d) 4–78 provides:

Mitigating circumstances are 1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case. While all twelve jurors must unanimously agree that the State has established beyond a reasonable doubt the existence of at least

jury in permissive language that mitigating circumstances are those which "may" be considered to extenuate a defendant's conduct and reduce the degree of blame allowed the jury to disregard mitigating evidence Postelle's failure to object to the permissive language waives the issue on appeal and review is for plain error only.[30] *See Myers v. State,* 2006 OK CR 12, ¶ 27, 133 P.3d 312, 324 (when specific objection is made at trial, this Court will not entertain different objection on appeal). Postelle's claim and the authorities upon which he relies are the same ones we recently rejected in *Harmon,* 2011 OK CR 6, ¶ 85, 248 P.3d at 944–45 (holding that second-stage instructions, when read as a whole, do not allow jury to disregard the mitigating evidence presented). We are not persuaded to reconsider this claim and it is denied.

¶ 87 Postelle argues that Instruction No 51, taken verbatim from Instruction No 4–76, OUJI–CR(2d), erroneously implies that a life sentence is appropriate only if the jury failed to find the existence of an aggravating circumstance This exact claim was also rejected in *Harmon,* 2011 OK CR 6, ¶ 86, 248 P.3d at 945. We note that this claim is specifically rebutted by the court's submission of Instruction No. 4–80, OUJI–CR(2d) (Instruction 55), which explicitly provided that the jury could impose a sentence of life imprisonment, with or without parole, even if the jury found that the aggravating circumstance(s) outweigh(s) any mitigating circumstance(s). Thus, there is no reasonable possibility that jurors read Instruction No. 51 as preventing them from considering life or life without parole as sentencing options if they found the existence of an aggravating circumstance. This is particularly evident in this case because Postelle's jury sentenced him to life imprisonment without the possibil-

ity of parole on two of the four murder charges, despite finding the existence of aggravating circumstances.

¶ 88 Postelle also challenges Oklahoma's death penalty scheme in its entirety as unconstitutional for vagueness, overbreadth, abuse of prosecutorial discretion, arbitrariness and because it constitutes cruel and unusual punishment. His brief provides neither argument nor authority to support these sweeping allegations. He purports, however, to "incorporate by reference" into his brief the arguments and authorities on these issues as they were raised in pretrial motions in the trial court. This claim does not comport with Rule 3.5(A)(5), *Rules of the Court of Criminal Appeals,* Title 22, Ch. 18, App. (2011), which requires an appellant's argument and authority to be contained within the pages of his brief. Failure to comply with the rule results in waiver of the issue on appeal. *See Harmon,* 2011 OK CR 6, ¶ 87, 248 P.3d at 945

¶ 89 Postelle further contends that the trial court erroneously denied his motion to strike Oklahoma's death penalty sentencing procedure as unconstitutional because it requires a jury to make special findings of fact prohibited by Okla. Const. art. VII, § 15.[31] Postelle asks us to reconsider our prior decision on this issue as set out in *Duckett v. State,* 1995 OK CR 61, ¶ 91, 919 P.2d 7, 27, but provides no argument or authority to support his claim. This issue is waived. Rule 3.5(A)(5), *Rules of the Court of Criminal Appeals,* Title 22, Ch. 18, App. (2011); *see also Cuesta–Rodriguez,* 2010 OK CR 23, ¶ 105, 241 P.3d at 245; *Harmon,* 2011 OK CR 6, ¶ 88, 248 P.3d at 945.

¶ 90 Postelle claims that the district court erroneously denied his motion to allow

one aggravating circumstance prior to consideration of the death penalty, unanimous agreement of jurors concerning mitigating circumstances is not required. In addition, mitigating circumstances do not have to be proved beyond a reasonable doubt in order for you to consider them.

30. Postelle asked the trial court to give a modified version of the instruction insofar as the instruction defined the term "mitigating circumstances," but he did not object to the permissive

language and, in fact, used the same permissive language in his proposed instruction as well.

31. Section 15 provides:

In all jury trials the jury shall return a general verdict, and no law in force nor any law hereafter enacted, shall require the court to direct the jury to make findings of particular questions of fact, but the court may, in its discretion, direct such special findings.

him the right of allocution and to make the last argument to the jury, but provides no argument or authority to support this claim. The issue is waived under Rule 3.5(A)(5), *Rules of the Court of Criminal Appeals*, Title 22, Ch. 18, App. (2011); *see also Harmon*, 2011 OK CR 6, ¶ 90, 248 P.3d at 946.

¶ 91 Like the defendants in *Harmon* and *Cuesta–Rodriguez*, Postelle claims that Oklahoma's use of lethal injection is cruel and unusual punishment in violation of the Federal and Oklahoma Constitutions. *See* U.S. Const. amend. VIII; Okla. Const. art. II, § 9. Postelle makes the same argument based on the same authorities that we rejected in our previous cases. *Harmon*, 2011 OK CR 6, ¶¶ 91–92, 248 P.3d at 946; *Cuesta–Rodriguez*, 2010 OK CR 23, ¶¶ 108–109, 241 P.3d at 245–46. Postelle gives us no reason to reconsider our prior decisions on this issue and we decline to do so.

¶ 92 Postelle claims that victim impact evidence is not relevant to proving either the aggravating or mitigating factors necessary to perform the narrowing function for application of the death penalty. He argues that victim impact evidence acts instead as a "superaggravator" and skews the sentencing proceeding in violation of the Eighth Amendment. We have repeatedly rejected this argument in the past and the authority relied upon by Postelle fails to persuade us to reach a different result here. *See Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 71, 241 P.3d at 236; *Hogan*, 2006 OK CR 19, ¶ 71, 139 P.3d at 932; *Thacker v. State*, 2005 OK CR 18, ¶ 16, 120 P.3d 1193, 1196; *Harris v. State*, 2004 OK CR 1, ¶ 58, 84 P.3d 731, 752.

¶ 93 Postelle claims that the jury was improperly instructed as to the scope of victim impact evidence. Specifically, he argues that Instruction No. 9–45, OUJI–CR (2d), which the district court gave as Instruction No. 61 of the second-stage jury instructions, contained language permitting jurors to consider that the victims were "individuals whose death may represent a unique loss to society and their families." Postelle argues that the phrase "unique loss to society" improperly allowed jurors to consider the im-

pact of the loss of the victims on society at large rather than simply the impact of the deaths on their immediate families. This identical claim was recently rejected in *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 74, 241 P.3d at 237. We reject it here for the reasons stated in that case.

### 20. Cumulative Error

¶ 94 Postelle asks this Court to consider the impact of the errors cumulatively, if no individual error warrants relief because of insufficient prejudice. "Cumulative error, however, does not deprive the defendant of a fair trial when the errors considered together do not affect the outcome of the proceedings." *Hanson v. State*, 2009 OK CR 13, ¶ 55, 206 P.3d 1020, 1035, *cert. denied*, —— U.S. ——, 130 S.Ct. 808, 175 L.Ed.2d 568 (2009). Postelle's claims, neither individually nor collectively, warrant relief.

### 21. Mandatory Sentence Review

¶ 95 Title 21 O.S.2001, § 701.13 requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" and "whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." After conducting this review, this Court may order any corrective relief that is warranted or affirm the sentence. 21 O.S.2001, § 701.13(E).

¶ 96 Having reviewed the record in this case, we find that Postelle's death sentences were not the result of trial error or improper evidence or witness testimony and that the death sentences were not imposed under the influence of any arbitrary factor, passion or prejudice.

¶ 97 The jury's finding that Postelle created a great risk of death to more than one person and that the murders were especially heinous, atrocious or cruel were amply supported by the evidence. Weighing the aggravating circumstances and evidence against the mitigating evidence presented, we find, as did the jury below, that the aggravating circumstances in this case outweigh the mitigating circumstances.

## DECISION

¶ 98 The Judgment and Sentence of the District Court is **AFFIRMED**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2011), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LEWIS, V.P.J., LUMPKIN, JOHNSON, and SMITH, JJ.: concur.